# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HIRAM ANDRADES, *pro se*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **Civil No. 11-305 (RCL)** |
| | ) |
| ERIC HOLDER, Attorney General, | ) |
| | ) |
| Defendant. | ) |
|  | ) |

## MEMORANDUM OPINION

Plaintiff, a Black Hispanic male of Puerto Rican heritage, applied for and was denied a position by a White Hispanic male of Puerto Rican heritage. The position was ultimately given to a White, non-Hispanic male. Plaintiff brought this action under Title VII of the Civil Rights Act of 1964, alleging, *inter alia*, discrimination on the basis of race and national origin. *See* Am. Compl., Count 1, ECF No. 10. Defendant has moved for summary judgment, Def.'s Mot., ECF No. 55, and the Court now grants the motion.

## I.     BACKGROUND

### A.  Factual Background[1]

#### 1.  *Plaintiff*

Plaintiff Hiram Andrades is an employee of the Bureau of Alchohol, Tobacco, Firearms and Explosives ("ATF"), an agency within the United States Department of Justice. Def.'s Statement ¶ 1, ECF No. 55; Pl.'s Statement 1, ECF No. 57. Mr. Andrades is a Black Hispanic

---

[1] This opinion only summarizes facts relevant to the present dispute. For additional background, see *Andrades v. Holder*, 845 F. Supp. 2d 305, 306–07 (D.D.C. 2012).

male of Puerto Rican heritage.   Def.'s Statement ¶ 1; Pl.'s Statement 1; Am. Compl. ¶ 3, ECF No. 10.

### 2.   *The Vacancy*

In January 2008, Mr. Andrades was working as a Program Manager—a non-supervisory position at the GS-14 level—in ATF's Washington, D.C., headquarters when a vacancy was announced for a Supervisory Criminal Investigator position.   Def.'s Statement ¶¶ 3–4; Pl.'s Statement 2; *see also* Vacancy Announcement 2, Ex. 1 to Decl. of Edgar A. Domenech, ECF No. 55-1.   The advertised position was at the same GS grade level as the Program Manager position Mr. Andrades held at the time.   *See* Vacancy Announcement 2; Def.'s Statement ¶ 1; Pl.'s Statement 1.   However, the vacant position involved supervisory duties which Mr. Andrades's position did not.   *See* Pl.'s Statement 2, 6, 9 ¶ 8; Def.'s Statement ¶¶ 33–34.   At ATF, occupying such a supervisory position for two years is a necessary prerequisite for advancing to the GS-15 level.   Pl.'s Opp'n 14; Def.'s Mem. 12–13.

The vacancy announcement indicated that ATF could fill the position either by the noncompetitive reassignment of an ATF employee already at the GS-14 level or by competitive promotion of a GS-13 employee.   *See* Vacancy Announcement 2; *see also* Def.'s Statement ¶¶ 5–6; Pl.'s Statement 1, 4.   GS-13 candidates interested in a competitive promotion would have to take a test offered by an Assessment Center that measured a variety of "competencies," and would be selected based on these assessments.   Def.'s Statement ¶ 6; Pl.'s Statement 1.   GS-14 candidates interested in a non-competitive transfer did not have to take this test.

### 3.   *Mr. Andrades's Application*

Mr. Andrades applied to be considered for the position as a non-competitive candidate. Def.'s Statement ¶ 17; Pl.'s Statement 3.  He was not selected for the position.  Def.'s Statement ¶ 32; Pl.'s Statement 8 ¶ 5.

### 4.   *Other Applicants For the Position*

Only one GS-14 candidate other than Mr. Andrades applied for the position as a non-competitive reassignment—a White, non-Hispanic male.  Def.'s Statement ¶¶ 15, 18.  He was also not selected.   Three GS-13 candidates applied for the position through the competitive process, including the candidate who ultimately received the offer—also a White, non-Hispanic male.  Def.'s Statement ¶¶ 14–15, 27, 32; Pl.'s Statement 8 ¶ 5.

### 5.   *The Decision*

Edgar Domenech, an ATF employee, had authority to decide whether to hire through the competitive or non-competitive process and which "competencies" tested by the Assessment Center were most relevant for the position.[2]   Def.'s Statement ¶ 7; Pl.'s Statement 2–3.   Mr. Domenech is a White Hispanic male of Puerto Rican heritage.  Def.'s Statement ¶ 16; Pl.'s Statement 1.  After the application period closed on January 31, 2008, Mr. Domenech received a certificate listing five individuals who had applied for the position: two through the non-competitive process (including Mr. Andrades), and three through the competitive process.[3]

---

[2] The four competencies Mr. Domenech identified as important to the vacant position were: knowledge of relevant laws, judgment and problem solving, leadership, and ability to relate to others.  Def.'s Statement ¶ 9.

[3] In fact, more candidates may have applied through the competitive process, but the certificate only listed the three best qualified based on their assessment scores in the competencies Mr. Domenech had identified as important for the position.  Def.'s Statement ¶¶ 27–28

Domenech Decl. ¶ 17.  The certificate provided the names of the two GS-14 non-competitive candidates (including Mr. Andrades) but not the GS-13 candidates.[4]  *Id.*

Mr. Domenech determined that the other GS-14 non-competitive candidate was not qualified for the position based on his own direct dealings with him.  Def.'s Statement ¶ 24; Pl.'s Statement 1.

On February 6, 2008, Mr. Domenech decided to "non-select" both of the non-competitive candidates and, instead, to hire through the competitive process.  Def.'s Statement ¶ 20; Pl.'s Statement 1.  On March 6, 2008, Mr. Domenech e-mailed Mr. Andrades and explained his decision as follows:

> I decided to go with the assessment center [i.e. competitive] route since I backfilled my last position via the reassignment route . . . . You clearly are capable but I wanted to balance how I fill my positions here. If any new position becomes available I will welcome your application for consideration.

E-mail from Edgar Domenech to Hiram Andrades, Mar. 6, 2008, Ex. 6 to Domenech Decl., ECF No. 55-1.

The Attorney General states that Mr. Domenech "was inclined to utilize the Assessment Center [i.e. competitive] process" for this position even before he knew which GS-14 employees had applied for the position as non-competitive candidates because (1) previous positions had been filled using the non-competitive process, *see* Def.'s Reply 3; Domenech Decl. ¶ 30; (2) GS-13 employees "were complaining that they were not getting an opportunity to advance," Def.'s Reply 4; Def.'s Statement ¶¶ 11–13; and (3) he had "participated in developing the testing underlying the [Assessment Center] promotion process," trusted its results, and "believed it was important to support that process," Def.'s Mem. 5, 15.  The Attorney General further states that

---

[4]  The parties dispute to what extent the competitive process is truly "blind" to all parties involved.  *Compare* Domenech Decl. ¶ 17, *with* Pl.'s Statement 4.  However, Mr. Andrades does not contest Mr. Domenech's claim that he did not know the identities of the competitive candidates at the time he chose to non-select Mr. Andrades.  *See* Def.'s Reply 8.

at the time he received the application, Mr. Domenech "was not certain of Mr. Andrades's investigative and operational abilities,"[5] Def.'s Statement ¶ 21; that he solicited information regarding Mr. Andrades from a supervisor who informed him that Mr. Andrades "did not have a reputation as a strong field agent," *id.* ¶ 22; and that Mr. Domenech searched the ATF case tracking system to locate closed cases where Mr. Andrades had been the case agent, but his search did not return any results, *id.* ¶ 23.

Mr. Andrades asserts that he was denied the position because of his race and national origin.  *See* Am. Compl., Count 1.  He complains that Mr. Domenech made his decision without reviewing his written application for the position and notes that Mr. Domenech's testimony does not contradict that claim.  Pl.'s Opp'n 8.  The Attorney General insists that it is Mr. Andrades who bears the burden of "providing [sic] that contention" and that he failed to offer any evidence that might do so.  Def.'s Reply 2.

### 6.  *Mr. Andrades's Subsequent Employment at ATF*

Effective October 25, 2009, roughly a year and a half after being denied this position, Mr. Andrades obtained a different supervisory field position.  Def.'s Statement. ¶¶ 34–35; Pl.'s Statement 1.  He continues to work in that position.  *See* Pl.'s Opp'n 1–2.

### B.    Procedural Background

In 2011, after failing to obtain the relief he sought at the administrative level, Mr. Andrades filed suit in this Court against Attorney General Eric Holder.  *Andrades v. Holder*, 845 F. Supp. 2d 305, 306–07 (D.D.C. 2012).   His amended complaint listed four counts under Title VII: (1) a race and nation-origin discrimination claim, relating to his non-selection in 2008 to the

---

[5] The Attorney General states that this was "because [Mr. Domenech] had not worked with [Mr Andrades] previously."  Def.'s Statement ¶ 21.  Mr. Andrades points to one instance where Mr. Domenech "approved emergency funds for witness relocation in an investigation that the Plaintiff requested . . . ."  Pl.'s Statement 4–5. He does not, however, assert that this one instance in any way discredits Mr. Domenech's claim that he was "not certain of Mr. Andrades's . . . abilities."

supervisory position (described above); (2) "a retaliation claim relating to his 2009 reassignment from an inspection of the Administration and Ethics Division to an inspection of the Disclosure and Forfeiture Division," *id.* at 307; (3) a retaliation claim based on ATF's omitting or removing his name from a list of candidates for a position, *id.* at 306; (4) "a hostile work environment claim, based upon the same acts that compose his other claims," *id.* at 307.

ATF "elected not to move to dismiss Count 1 . . . , believing that additional factual development [was] required to properly evaluate [the claim]." *Id.* at 307. The Court dismissed Counts 2 and 3 for failure to state a claim upon which relief could be granted. *Id.* at 308–09. Mr. Andrades withdrew Count 4, the hostile workplace claim. *Id.* at 308.

## II.    LEGAL STANDARD

### A. Summary Judgment

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it could affect the outcome of the case. *Id.* A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The non-movant, however, must establish more than "the existence of a scintilla of evidence" in support of his position, *id.* at 252, and may not rely solely on allegations or conclusory statements, *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### B. Title VII

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a). Section 2000e-16(a) makes Title VII applicable to federal agencies, and although the language of that provision differs slightly from section 2000e-2(a), the D.C. Circuit has held that Title VII "places the same restrictions on federal . . . agencies as it does on private employers." *Singletary v. Dist. of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003). The D.C. Circuit has succinctly stated the proper judicial method for resolving this type of case:

> In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court . . . must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

### III.   ANALYSIS

### A.  Mr. Andrades Suffered an Adverse Employment Action

The agency's non-selection of Mr. Andrades for a lateral reassignment to a supervisory position at the same GS-level constitutes an adverse employment action.

"In order to present a viable claim of employment discrimination under Title VII, a plaintiff must show he suffered an adverse employment action." *Douglas v. Donovan*, 559 F.3d 549, 551–52 (D.C. Cir. 2009). An "adverse employment action" is "a significant change in

employment status, such as . . . failing to promote, *reassignment with significantly different responsibilities*, or a decision causing significant change in benefits." *Id.* (emphasis added) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)).  Regarding lateral transfers (i.e. transfers without any change in salary, grade, or benefits), the D.C. Circuit has explained:

> A plaintiff who . . . is denied a lateral transfer . . . does not suffer an actionable injury *unless there are some other materially adverse consequences affecting the terms, conditions, or privileges* of her employment *or her future employment opportunities* such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.

*Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003) (emphasis added) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)); *see also Andrades*, 845 F. Supp. 2d at 309 ("[A] delay in obtaining a lateral assignment cannot amount to an adverse action *without accompanying material adverse consequences*." (emphasis added) (internal quotations omitted)). A compelled lateral transfer that withdraws an employee's supervisory duties constitutes an adverse employment action.  *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (quoting *Stewart*, 352 F.3d at 426).

   For example, in *Czekalski*, the Circuit found that a plaintiff had raised a genuine issue (precluding summary judgment) as to whether she had suffered an adverse employment action where a reassignment "left her with 'significantly different'—and diminished—supervisory and programmatic responsibilities," even where her pay, benefits, and grade level were not affected by the transfer.  475 F.3d at 364–65 (plaintiff claimed that before the transfer, she supervised 700 employees; after the transfer, she supervised fewer than 10).

   Outside the context of lateral transfers, the D.C. Circuit has explained that "if an employee is denied the opportunity to compete for a promotion, she has suffered an adverse employment action; we do not inquire whether she would have received the position but for the

8

discrimination." *Douglas*, 559 F.3d at 552 (citing *Cones v. Shalala*, 199 F.3d 512 (D.C. Cir. 2000)).

Here, the position Mr. Andrades was non-selected for was at the same GS grade level as the position he held at the time. *See* Vacancy Announcement 2; Def.'s Statement ¶ 1; Pl.'s Statement 1. However, the position involved new supervisory duties. *See* Pl.'s Statement 2, 6, 9 ¶ 8; Def.'s Statement ¶¶ 33–34. The harm suffered by Mr. Andrades in the present case is like that suffered by plaintiff in *Czekalski*, where the Court found that a significant diminishment in supervisory responsibilities resulting from a compelled transfer was sufficiently "adverse" to ground a suit, notwithstanding the lack of any diminishment in pay, grade, or benefits associated with the transfer. Likewise, Mr. Andrades was denied supervisory responsibilities when he was rejected for the transfer, and therefore suffered an adverse employment action.[6]

Moreover, at ATF, holding this type of supervisory position for two years was a necessary prerequisite for advancing to the GS-15 level. Pl.'s Opp'n 14; Def.'s Mem. 12–13. The non-selection of Mr. Andrades for this position prevented him from becoming qualified for further promotions, a "materially adverse consequence[] affecting the terms, conditions, or privileges of . . . [his] future employment opportunities." *Stewart*, 352 F.3d at 426.

That Mr. Andrades was subsequently able to obtain a different supervisory field position, *see* Def.'s Statement. ¶¶ 34–35; Pl.'s Statement 1, does not "cure" this allegedly discriminatory action. "An employer may cure an adverse employment action . . . before that action is the subject of litigation," but the D.C. Circuit has found such "cure" only where an employer takes actions that completely undo the effects of the alleged adverse action. *See Taylor v. Small*, 350

---

[6] While the harm suffered is similar in both cases (*i.e.* denial of supervisory responsibilities), the *form* in which the harm was delivered is not (*i.e.*, a compelled transfer in *Czekalski* vs. a denied transfer here). However, for purposes of determining whether this amounts to an adverse employment action, the Court finds that this difference in form is irrelevant: in both cases, the plaintiff ends up without supervisory responsibilities that he would have had but for the intervening (allegedly) discriminatory act.

F.3d 1286, 1293 (D.C. Cir. 2003); *see also White v. Burlington N. & Santa Fe Ry. Co.,* 310 F.3d 443, 452 (6th Cir. 2002) (cited approvingly by the D.C. Circuit in *Taylor v. Small* for the proposition that a reinstatement that "puts the plaintiff in the *same position she would have been in* absent [a] suspension . . . negat[es] a potentially adverse . . . employment decision" (emphasis added)); *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (cited approvingly in *Taylor v. Small* for the proposition that "[w]e need not address whether a mere delay in promotion constitutes an adverse employment action because [plaintiff] received the promotion *with retroactive pay and seniority*" (emphasis added)). For instance, in *Taylor*, the court found that a denial of a bonus was "cured" when the employer paid the bonus. *Id.* at 1294. Here, Mr. Andrades's career advancement was delayed by 18 months when he was deprived of taking on supervisory responsibilities and when his eligibility for further promotion was delayed. This delay has not been "cured" by his subsequent acquisition of a similar position.

The fact that plaintiff has not, in fact, received a promotion to the GS-15 level since becoming eligible for one in 2011 (two years after taking the supervisory position) does not mean he suffered no harm by the eighteen month delay in eligibility. The D.C. Circuit held that "if an employee is denied the opportunity to compete for a promotion, [he] has suffered an adverse employment action; we do not inquire whether [he] would have received the position but for the discrimination." *Douglas*, 559 F.3d at 552. In this case, Mr. Andrades was denied the opportunity to compete for a promotion to a GS-15 level position for eighteen months. The Court concludes that that delayed eligibility amounts to an adverse employment action.

## B. The Attorney General Has Asserted Several Legitimate, Non-Discriminatory Reasons for the Challenged Decision

The Attorney General provides several legitimate, non-discriminatory reasons for Mr. Domenech's decision to non-select Mr. Andrades for the position. First, Mr. Domenech was

committed to using the Assessment Center process for this position because (1) previous positions had been filled using the non-competitive process; (2) GS-13 employees "were complaining that they were not getting an opportunity to advance"; and (3) he had "participated in developing the testing underlying the [Assessment Center] promotion process," trusted its results, and "believed it was important to support that process."  Def.'s Statement ¶¶ 11–13; Def.'s Mem. 5, 15.  Second, Mr. Domenech had reason to believe that Mr. Andrades was not a strong candidate for the position because (1) he was told by a supervisor that Mr. Andrades "did not have a reputation as a strong field agent," Def.'s Statement ¶ 22, and (2) he searched the ATF case tracking system to locate closed cases where Mr. Andrades had been the case agent, but his search did not return any results, *id.* 23.

The Attorney General points to other evidence to defeat Mr. Andrades's claims of discrimination.  First, the only other non-competitive candidate for the position (who was also rejected) is White.  Def.'s Mem. 17.  Second, Mr. Domenech is, like Mr. Andrades, of Puerto Rican ancestry.  Def.'s Mem. 4.  Third, at the time he decided to non-select Mr. Andrades (and the other non-competitive candidate), Mr. Domenech did not know the identities of the three eligible competitive candidates. Def.'s Mem. 5; Def.'s Reply 8; Domenech Decl. ¶ 17; *cf. supra* note 4.

### C.  Mr. Andrades Has Not Produced Sufficient Evidence for a Reasonable Jury to Find that the Asserted Legitimate, Non-Discriminatory Reason for the Challenged Decision Was Not the Actual Reason

Under D.C. Circuit caselaw, this Court must now decide whether Mr. Andrades has "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated

against the employee on the basis of race . . . or national origin." *Brady*, 520 F.3d at 494.  The

Court finds that he has not and will grant summary judgment to the Attorney General.

Mr. Andrades's evidence that he was discriminated against on the basis of his race and

national origin is limited to three points: (1) the person ultimately selected for the position was

White, Pl.'s Statement 8 ¶ 5; (2) Mr. Domenech's testimony fails to mention whether he actually

reviewed his written application before rejecting him, Pl.'s Opp'n 8, 10, 12; and (3) Mr.

Andrades had more experience than the selectee, i*d.* at 11.  No reasonable jury could conclude on

the basis of this evidence that defendant's legitimate non-discriminatory reasons are pretextual.[7]

First, as to the selectee's race, this might support an inference of discrimination but for

the fact that, according to the Attorney General's unrebutted evidence, at the time Mr. Domenech

decided to non-select Mr. Andrades, he did not know the identities of the three candidates who

were in contention for the position through the competitive program.  Def.'s Mem. 5; Def.'s

Reply 8; Domenech Decl. ¶ 17; *cf. supra* note 4.  Moreover, the other non-selected non-

competitive candidate was White.  Def.'s Statement ¶¶ 15, 18.  In order to demonstrate a

discriminatory reason in these circumstances, Mr. Andrades would, at the least, have to show

that a decision to use the competitive hiring process was tantamount to choosing a White

---

[7] Mr. Andrades's assertions regarding the supposed inconsistency between the explanation given for his non-selection by Mr. Domenech in his March 2009 e-mail and those he provided in testimony here are unconvincing. *See* Pl.'s Opp'n 11–13.  The e-mail explained that Mr. Domenech wanted to "balance" how he filled positions and "decided to go with the assessment center [i.e. competitive] route since [he] backfilled [the] last position via the reassignment route . . . ."  E-mail from Edgar Domenech to Hiram Andrades, Mar. 6, 2008.  Mr. Domenech's subsequent testimony adheres to this explanation, as does the Attorney General's theory of the case.

Nor is there an inconsistency between Mr. Domenech's note in his e-mail that Mr. Andrades was "capable" and subsequent testimony that his decision not to give the position to Andrades was in part because he had learned from another supervisor that Andrades "did not have a reputation as a strong field agent."  Def.'s Statement ¶ 22.  The e-mail was not a *comprehensive* statement of reasons for the decision.  Nor does Mr. Domenech's statement that Mr. Andrades was "capable" at his *current* position necessarily contradict his determination (based on information gathered from the other supervisor) that he lacked the skills needed to move to a *new* role.  Moreover, even if there were a conflict between these statements, Mr. Andrades has still shown no reason to infer any discriminatory motive from such conflict.  Accordingly, these arguments are rejected.

candidate.   Since he has not done so here, no inference of discrimination can be drawn from the bare fact that the selectee was White.

Second, the Court agrees with Mr. Andrades that there is an issue of fact as to whether Mr. Domenech reviewed his written application before deciding to non-select him for the position.   However, Mr. Domenech did testify that he consulted other sources regarding Mr. Andrades's qualifications.   More importantly, Mr. Andrades has failed to demonstrate why Mr. Domenech's failure to review his written application (if indeed there was such a failure) implies discrimination rather than merely reflecting Mr. Domenech's commitment to using the competitive hiring program on this occasion.

Third, Mr. Andrades's allegedly superior experience here is irrelevant from the perspective of this Title VII suit.   The selectee was chosen not based on his overall qualifications, but rather—pursuant to the rules governing the competitive hiring process—on the scores that he received in his Assessment Center test in the four "competencies" identified by Mr. Domenech.

Because Mr. Andrades has failed to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason[s] w[ere] not the actual reason[s] and that the employer intentionally discriminated against the employee on the basis of race . . . or national origin," *Brady*, 520 F.3d at 494, the Court will grant the Attorney General's motion for summary judgment.

## IV.    CONCLUSION

Defendant's motion for summary judgment is granted.   An order shall issue with this opinion.

Signed by Royce C. Lamberth, Chief Judge, on April 16, 2013.

13